IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 20, 2010 Session

IN RE MADISON N.J.M.

Appeal from the Circuit Court for Knox County
No. 112305     Bill Swann, Judge

No. E2009-01625-COA-R3-JV - FILED JUNE 28, 2010

This is a case involving the custody of a minor child, Madison N.J.M. ("the Child"). The
Child lived with her mother, K.S. ("Mother"),[1] until she was four. After the Child was
adjudicated dependent and neglected, she was placed in the temporary custody of her
maternal grandmother, L.R. ("Grandmother"). Grandmother later sought permanent custody.
A paternity suit was filed and it was ultimately determined that C.A.M. ("Father") is the
Child's biological father. Soon after paternity was established, Father entered into a
mediated agreement which provided that Grandmother would remain as the Child's primary
caregiver with parenting time for Father. A final order adopting the terms of the mediated
agreement was entered and Grandmother was granted custody of the Child. Father actively
pursued a parental relationship and increased time with the Child; he later sought full
custody. Following a bench trial, the juvenile court ordered a change of custody from
Grandmother to Father based upon its finding of a material change in circumstances and its
determination that custody with Father is in the best interest of the Child. On appeal *de novo*
to the trial court, the judgment was affirmed. Grandmother appeals. We also affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY
and JOHN W. MCCLARTY, JJ., joined.

Brandy Boyd Slaybaugh, Knoxville, Tennessee, for the appellant, L.R.

Wayne Decatur Wykoff, Knoxville, Tennessee, for the appellee, C.A.M.

---

[1]During the proceedings below, Mother twice petitioned for custody of the Child. Both petitions
were dismissed. Mother did not challenge the final order and is not a party to this appeal.

# OPINION

## I.

The parties stipulated the findings of fact as set forth in the final order of the juvenile court referee.[2]  The relevant facts and procedural history of this litigation follow.

The Child was born to Mother in July 2000; at the time of the final hearing in this matter she was eight.  When the Child was born, Mother was legally married to one man (not Father) but living with another – her boyfriend, R.S. Father and Mother had dated for a few months in 1999.  According to Father, he ended their relationship when he learned that Mother was married.  Father later learned from a friend that Mother was pregnant but, being aware that Mother was married and seeing other men besides himself around the time of conception, he did not pursue a paternity determination.  As a result of a paternity action filed by Mother, Father learned in 2005 that he was the Child's father.  Shortly after his paternity was determined, Father married T.M.  ("Stepmother").

In January 2005, Grandmother became the Child's primary caregiver when Mother stopped having regular contact with the Child.  Mother left the Child and some of her siblings with Grandmother and went to live with R.S., with whom she had three children.  Mother has a total of nine children including the Child.  Three lived with their biological fathers, three, including the Child, lived with Grandmother, and three lived with Mother and R.S., their biological father.   On January 11, 2005, Grandmother initiated the present case by filing a petition to declare the Child dependent and neglected and moved for custody of the Child.  The petition, also signed by Mother, indicated that Mother was unemployed and unable to care for the Child.  On that same date, the court entered an order granting Grandmother temporary legal and physical custody of the Child.  Shortly thereafter, a petition to establish paternity was filed.  Father was named as a defendant.  While the Child was in her custody, Grandmother continued to exercise all decision-making and financial responsibility for her without assistance from Mother.  Grandmother maintained private schooling, family counseling, and individual professional therapy for the Child for the separation anxiety the Child experienced when Mother left her with Grandmother.  Ms. Cookie Oakley, a licensed clinical social worker, became the Child's therapist.  Ms. Oakley was also Grandmother's long-time therapist, having initially provided Grandmother with counseling for her own, unrelated employment matters since 2000 before she began working with the Child and her siblings in Grandmother's care.

---

[2]Accordingly, no hearing transcript or statement of evidence is included in the appellate record; as with the circuit court and the parties, we rely on the extensive factual findings of the juvenile court referee stipulated to by the parties.

-2-

After paternity was established, Father began visiting the Child and paying child support.  At the outset, the child support referee directed that Father would have supervised visitation with the Child, to be followed in short order by unsupervised visits.  Ms. Oakley, however, did not agree with the referee's order and recommended that Father's time with the Child cease as of May 2005, pending an evaluation of Father and his circumstances and Father's attendance at family counseling sessions.  In June 2005, at the request of the Child's guardian ad litem, Grandmother, Father, and Mother were referred to mediation concerning Father's parenting schedule and Grandmother's pending petition for custody.  The parties reached a mediated agreement filed on June 29, 2005, which provided that Grandmother would remain the Child's primary caregiver.[3]  In addition, Father would have a two-hour visit with the Child each weekend to commence when recommended by Ms. Oakley.  Father's schedule with the Child would progress as directed by Ms. Oakley and overnight time with the Child would only begin under her recommendation.  Further, all of Father's time would be supervised by Grandmother.  The agreement further permitted Mother unsupervised time with the Child as agreed between Mother and Grandmother.

A final hearing was held on Grandmother's petition for custody on November 28, 2005.  Neither Father nor his counsel were present.  The referee accepted the June 2005 mediated agreement and incorporated it in the court's final order[4] whereby full custody of the Child was formally awarded to Grandmother and Father was granted time with the Child pursuant to Ms. Oakley's recommendations.

Some six months later, in April 2006, Father filed a "Petition to Enter Permanent Parenting Plan and Establish Rule 26 Visitation."  Therein, Father asserted that despite his completion of therapy sessions with Ms. Oakley and parenting classes, he had been permitted "only minimal day visits" with the Child and wished to exercise "standard overnight visitation."  An agreed interim order permitted eight hours of unsupervised time with the Child by Father on alternating Saturdays with a progress review after six to eight weeks.  By agreement, the hearing to review Father's progress with the Child was continued to January 2007.  Prior to that date, however, Grandmother obtained counsel and moved to dismiss Father's pending petition for a permanent parenting plan and time with the Child.  Grandmother asserted that Father's petition failed to allege a material change of circumstances as required to modify the terms of the November 28 final order.  A second interim order entered in January 2007 continued Father's weekend time schedule; permitted Father to obtain an independent psychologist to assist in determining a treatment plan for the

---

[3]The mediated agreement is referenced by the juvenile court but is not included in the record before this Court.

[4]The final order was entered in November 2006 *nunc pro tunc* to November 28, 2005.

Child; authorized one additional mid-week visit by Father; adopted the parental bill of rights to allow Father's interaction with the Child at various school and extracurricular events; authorized the commencement of overnight time with the Child by Father upon the agreement of the psychologist Father selected, Dr. Thomas Hanaway, and Ms. Oakley; denied Grandmother's motion to dismiss; and continued Father's pending petition. The following month, Mother also filed a petition seeking custody of the Child.

On June 26, 2007, Father petitioned for custody to be changed from Grandmother to Father. The final hearing was reset for October 2007. In the meantime, Grandmother approached Father and requested that he surrender the Child to permit Grandmother and her husband to adopt her. Father declined the request and filed a motion for contempt in which he alleged that Grandmother had failure to cooperate with Dr. Hanaway in his assessment of a treatment plan for the Child. On October 10, 2007, an agreed order was entered that granted Father permission to begin overnight time with the Child for one night every other weekend in addition to continuing his afternoon visits one day each week. Any further time with the Child was permitted as recommended by Ms. Oakley and the guardian ad litem. In addition, Mother agreed to dismiss her custody petition.

Following negotiations between the parties, another agreed order was entered in December 2007 that further addressed Father's time with the Child and co-parenting matters between Grandmother and Father. Father's co-parenting time was increased to a full weekend every other weekend. In addition, Father was to have the Child from the evening of Christmas Eve until 6:00 p.m. on Christmas Day. Father and Grandmother were ordered to see Dr. Hanaway for co-parenting counseling and the referee directed that increased co-parenting by Father would take place as recommended by Dr. Hanaway.

A bench hearing on the competing petitions for custody of the Child was held over two days in April 2008. Three days before the hearing, Mother again sought custody of the Child. In her petition, Mother stated that Grandmother had agreed that Mother was ready to regain custody. At the hearing, the referee received the custodial evaluation and recommendations from Dr. Hanaway. Overall, Dr. Hanaway concluded that both Grandmother and Father could provide the Child with a stable home and "good parenting." As summarized by the referee, Dr. Hanaway "did not agree with the time schedule for progression with [Father's] visitation implemented by Ms. Oakley (for the [C]hild's therapist to evaluate the transition at six month intervals) due to the [C]hild's progress and the level of comfort and attachment demonstrated by the [C]hild toward [Father]." Dr. Hanaway recommended a joint custody arrangement whereby Grandmother and Father would alternate custody of the Child each week.

Ms. Oakley testified that the Child was in a stable environment with Grandmother and that her attachment issues had been successfully addressed. She acknowledged that the Child had bonded with Father and that this bond was growing since Father's time with the Child had begun. Ms. Oakley supported Mother's petition for custody because "(a) a female child needs her mother; (b) the [C]hild lived with [Mother] for the first four years of her life, and (c) the [C]hild's strongest attachment has been with [Mother]." [5] Ms. Oakley disagreed with Dr. Hanaway's recommendation of a potential shared custody arrangement between Grandmother and Mother; she endorsed custody of the Child being with Grandmother, Mother, or a shared arrangement between them as the best options. Ms. Oakley stated that there would be no negative consequences to the Child from increased contact with Father – she regarded the issue as being how much time Father should receive. The referee noted that Ms. Oakley "did not understand why [Father] filed a Petition for Custody because his visitation was increasing on the schedule she had developed despite [Father's] feelings that progress was not occurring quickly enough."

Mother testified that Father had sought a relationship with the Child since his paternity was established and she had no concerns about the Child spending time with him; Mother was emphatic that Father would be in the Child's life if she was awarded custody. Among Mother's concerns if Father received custody was that Mother would not be able to see the Child and that the Child had stated she loved Father and wanted to visit him but did not want to live with him because she would never see Mother or Grandmother again.

The referee summarized Father's testimony describing his time with the Child: "Father has had difficulty seeing the [C]hild – [Father] believed meeting with [Ms. Oakley] would enable him to move toward a standard visitation arrangement soon after paternity was established, however, progress from supervised to unsupervised to overnights to weekends took a long time (the therapist wanted six month intervals to observe each incremental modification in [Father's] visitation). . . ." Father recognized the importance of Grandmother and Mother in the Child's life and supported their continued contact with her.

Grandmother explained that she had proposed adopting the Child to maintain the Child's emotional welfare but said she intended to maintain the Child's contact with Father. Grandmother noted that she had never indicated that Mother could never regain custody of the Child; she favored Mother regaining custody because she felt Mother had made significant progress "in getting her life together." In her testimony on April 11, Grandmother indicated she would agree to a joint custody arrangement with Father as recommended by Dr. Hanaway.

---

[5]Ms. Oakley's testimony as summarized by the referee.

At the conclusion of the hearing, the trial court announced its finding of a material change in circumstances. The court ordered co-parenting time between Grandmother and Father pending a hearing on May 20, 2008, at which time the court anticipated a final disposition of the case. Notably, Grandmother's views had changed since the April hearing. In her motion for reconsideration of the court's finding, Grandmother stated she no longer supported sharing custody of the Child with Father. Further, she stated she no longer supported returning custody of the Child to Mother.

The referee conducted her best interest analysis and concluded it was in the Child's best interest for Father to be the primary residential parent. In its June 16, 2008, final order modifying custody, the referee further ordered continued time for Grandmother with the Child on alternating weekends and some holidays, and day visits by Mother during Grandmother's established times. The juvenile court confirmed the referee's judgment in all respects.

On appeal de novo to the Circuit Court for Knox County, the circuit court confirmed the findings of the juvenile court with one exception pertaining to the juvenile court's multiple bases for a change in circumstances. In its order, the circuit court stated in relevant part as follows:

> The argument presented was a legal argument touching upon two issues: (1) whether or not the findings of a material change of circumstances surrounding the [Child] by the lower [c]ourt constitute a material change under the case law in this State, and (2) whether or not the best interest analysis by the lower court was accurate.

> The lower [c]ourt found three areas in which there were material changes in circumstances such that a change in custody was warranted. The first, that Grandmother made a statement during testimony that the [Child] should return to . . . [Mother's] custody should she become stable, cannot constitute a material change in circumstances which warrants a change in custody.

> The second and third findings, that since August 2005 there has been ongoing gender discrimination against [Father] and that [Father] has worked extraordinarily hard to expand contact with his [Child] against much resistance are confirmed.

-6-

Upon the finding of the above material change in circumstances surrounding this [Child], this Court is in complete accord with the best interest analysis presented in the Order of the Juvenile Court [Referee]. . . .

Grandmother filed a timely notice of appeal.

II.

Grandmother raises issues on this appeal that we restate for clarity:

> 1. Did Father sufficiently allege a material change of circumstances to support his petition for a change in custody?
>
> 2. Did the trial court err in finding that "ongoing gender discrimination" against [Father] and Father's efforts to expand contact with the Child against "much resistance" constituted a material change in circumstances sufficient to warrant a change in custody?
>
> 3. Did the trial court err in finding that a change in custody was in the best interest of the Child?

III.

The determinations of whether a material change in circumstances has occurred and where the best interest of the child lies are factual questions. *Turner v. Purvis*, No. M2002-00023-COA-R3-CV, 2003 WL 1826223 at *4 (Tenn. Ct. App. M.S., filed April 9, 2003). A trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2006); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). We review a trial court's conclusions of law under a de novo standard upon the record with no presumption of correctness. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

Because of the discretion given trial courts in the primary residential parenting area and because of the fact-specific nature of these decisions, appellate courts are reluctant to second-guess a trial court's determinations regarding residential parenting and visitation. *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001). Further stated, such decisions frequently turn on a determination of the credibility of the testimony, and the appellate courts

are hesitant to reverse the trial courts' decisions because the trial judge was able to observe the witnesses and judge their credibility. ***Adelsperger v. Adelsperger***, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). Accordingly, this Court will not reverse a trial court's decision regarding residential parenting status unless the record clearly demonstrates that the trial court has abused its discretion. ***Parker v. Parker***, 986 S.W.2d 557,563 (Tenn. 1999). A trial court abuses its discretion only when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001)(quoting ***State v. Shirley***, 6 S.W.3d 243, 247 (Tenn. 1999)).

IV.

Although Grandmother frames her first issue as contesting the sufficiency of Father's pleadings underlying his petition to change custody, we conclude that both her first and second issues essentially challenge the trial court's finding that there was a material change in circumstances sufficient to warrant a change in the primary residential parenting status. We therefore address the first two issues together. In short, Grandmother asserts that none of the circumstances relied upon by the lower courts in this case are sufficient to warrant modification of the earlier decree.

In ***Blair v. Badenhope***, 77 S.W.3d 127(Tenn. 2002), the Supreme Court announced the standard applicable in custody modification disputes between a parent and a non–parent after the non-parent had been granted primary residential parent status. The Court stated: "A trial court should apply the standard typically applied in parent-vs-parent modification cases: that a material change in circumstances has occurred, which makes a change in custody in the child's best interest." ***Id.*** at 143 (citing, *e.g.*, ***Nichols v. Nichols***, 792 S.W.2d 713, 715-16 (Tenn. 1990)).

Subsequently, in ***Kendrick v. Shoemake***, 90 S.W.3d 566, 570 (Tenn. 2002), the Court elaborated upon its holding as follows:

> As explained in ***Blair***, the "threshold issue" is whether a material change in circumstances has occurred after the initial custody determination. ***Id***. at 150. While "there are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody," the following factors have formed a sound basis for determining whether a material change in circumstances has occurred: the change "has occurred after the entry of the order sought to be modified," the change "is not one that was known or reasonably

anticipated when the order was entered," and the change "is one that affects the child's well-being in a meaningful way." *Id.*

(Citations omitted.) The determination of a material change in circumstances is the first step in a two-part analysis the trial court must apply in resolving a petition to modify a custody decree. That is, "[i]f a material change in circumstances has occurred, it must then be determined whether the modification is in the child's best interest[]." *Id.*

In the present case, in determining that a material change of circumstances had occurred, the referee found in relevant part as follows:

> The mediated agreement signed by [Father, Mother, and Grandmother] on 6-28-05 definitively states that [Grandmother] would like for [Father and Mother] "to be actively involved in [the Child's] life and for everyone to get along."
>
> *    *    *
>
> The requirement of showing a material change in the [Child's] circumstance is to establish finality and stability for the [Child's] placement when considering future custody and visitation issues by ensuring the focus is on the [Child].
>
> The testimony presented by [Grandmother] that the [Child] should be returned to [Mother's] custody when [Mother] is stable (which was endorsed and recommended by the [Child's] therapist) establishes that a material change has occurred which materially affects the [Child] in that [Father] has been placed in a subordinate and auxiliary role with [Mother] viewed as having a more superior parental role than agreed to in the Final Order - [Grandmother] is willing to restore custody of the [Child] to [Mother] if [Mother] does not pose a substantial risk of harm to the [Child], but is not willing to transfer custody of the [Child] to [Father] based upon the same analysis despite his demonstrated stability, his established relationship with the [Child], and his demonstrated . . . commitment to parenting the [Child].
>
> The [Child's] continued placement in [Grandmother's] custody is subject to change based upon both personal and gender-

-9-

specific discrimination against [Father] by [Grandmother] and the [Child's] therapist (the [Child's] therapist testified that a female child needs to be with her mother) which was not anticipated from the agreed Final Order entered in 2005.

[Father] has been required to seek the Court's intervention to obtain progressive contact with the [Child] and [Father] continued to have less than standard visitation recommended by the [Child's] therapist after two years of incremental expansion despite the therapist's testimony that the [Child's] emotional and behavioral problems stemming from her separation from [Mother] were under control in March 2007 and the [Child] was bonding to [Father] ([Father] was not able to move to overnight visitation with the [Child] until he had secured an independent Custody Evaluation from Dr. Thomas Hanaway who recommended an immediate move to overnight visitation for [Father] with the [Child] in October 2007).

(Parenthetical information in original; paragraph breaks inserted for ease of reading). In summary, the referee concluded that " a change in circumstances has occurred that materially affects the [Child] based upon (a) the change in the stability of the [Child's] placement with [Grandmother] and (b) the discrimination against the developing parental role of [Father] with the [Child] by [Grandmother] and the [Child's] therapist. . . ."

Initially, we note our agreement with the circuit court's conclusion that, Grandmother's testimony at trial, in and of itself, cannot constitute a material change in circumstances to support a change in custody. In order to justify a change in a custodial arrangement, there must be "such a change in circumstances as will directly affect the welfare of the minor." ***Dailey v. Dailey***, 635 S.W.2d 391, 393 (Tenn. App. 1981). Grandmother's expressed preference for the Child to be returned to Mother's custody when Mother became stable is not a "circumstance" at all, but merely a statement of her opinion. The referee, however, did not rely on Grandmother's statement in isolation in concluding that a change of circumstances had occurred. As noted, the referee further found that Grandmother and Ms. Oakley discriminated against Father by opposing his efforts at expanded contact with the Child despite the growing bond between the two of them and the Child's own desire to see Father more. Father was eventually forced to turn to the courts to gain even "standard" time with the Child. The referee summed up Father's difficulties regarding parenting time in an order declaring the case extended and complex as follows:

> Despite all the "agreed" orders in this matter, there was little agreement. [Grandmother] consistently acted to prevent or delay [Father's] building a relationship with the [C]hild. It took over 2 years for [Father] to get court ordered "standard visitation." He did everything the Court asked of him and everything the two therapists asked of him.
>
> At all times, we awaited the ok from therapists to move forward with increased visits. [Father] had to file petitions with this Court at each stage of the proceedings in order to get that which had been previously ordered.

The evidence does not preponderate against the referee's conclusion, confirmed by the circuit court, that the circumstances surrounding the Child had materially changed. Clearly, Grandmother and Ms. Oakley opposed any arrangement whereby Father might gain full or even partial custody of the Child. Grandmother indicated her preference that her own daughter, Mother, regain custody, while Ms. Oakley held a firm belief that a female child belongs with her mother. In our view, the discriminatory sentiments of Grandmother and Ms. Oakley against Father's potential parenting role led them to resist his efforts to expand his relationship with the Child by ensuring that his relationship with the Child progressed as slowly as possible. Although a part of its subsequent analysis of the best interest of the Child, we find the following language best sums up the court's findings regarding a material change of circumstances as well. The referee found as follows:

> The original agreement mediated in 2005 between [Mother, Father, and Grandmother] set goals for each in their relationships with each other and with the [C]hild: (1) [Father] "would be a permanent, regular, loving dad to [the Child]," (2) [Mother] would "remain in [the Child's] life as her mom," and (3) [Grandmother] "will remain [the Child's] primary caregiver" and "would like [Father and Mother] to be actively involved in [the Child's] life, and for everyone to get along."
>
> *   *   *
>
> [Grandmother's] plans for the [C]hild's future stability have ranged from adoption to returning the [C]hild to [Mother]. [Father's] success in establishing a relationship with the [C]hild and the [Father's] importance in the [C]hild's life have been minimized by [Grandmother] and [Ms. Oakley]. [Father] has

persisted in overcoming all obstacles placed before him in his efforts to gain greater access to his daughter – with those obstacles arising from [Grandmother and Ms. Oakley] who indicated she would support [Mother] regaining custody . . . but would not consider [Father] to be an appropriate custodian because a female child needs to be with her mother.

\* \* \*

A significant amount of distrust has developed between [the parties] regarding their level of cooperation due to the prolonged transition schedule imposed for [Father] during the preceding three years.

As can be seen throughout its final order, the referee found that there was a change in circumstances surrounding the Child from the situation that existed at the time the parties entered into the 2005 mediated agreement – the basis of the earlier custody decree. Grandmother, who had agreed to remain the Child's primary caregiver, revealed that she would not oppose returning custody to Mother, but would not support awarding custody to Father in the future despite her acknowledgment of his stability. As Father became frustrated with the slowly progressing co-parenting schedule and eventually sought a formal parenting plan and then custody of the Child, Grandmother opposed his efforts in court while Ms. Oakley maintained lengthy intervals between any increases in Father's contact with the Child. In opposing Father's petition for a permanent parenting plan, for example (in which Father proposed a residential schedule of 234 days with Grandmother and 131 days with Father), Grandmother asserted that Father had failed to establish a material change in circumstances and emphasized that Father had failed to establish that it was in the Child's best interest to have expanded visitation with Father "*against [Ms. Oakley's] recommendation*." (Emphasis in original motion.) Clearly, this was not the arrangement Father had anticipated when he initially agreed that Grandmother should remain the Child's caregiver in 2005 and completed sessions with Ms. Oakley in an effort to gain regular time with the Child; the referee noted that from June 2005 through October 2007, Father had been limited to day visits on Ms. Oakley's recommendation. Moreover, within its best interest analysis, the referee found that "the delays in expanding [Father's] visitation with the [C]hild have interfered with the natural progression of the [C]hild's attachment to [Father]." In our view, this finding also evidences a material change in circumstances regarding Father's developing relationship with the Child "that affects the child's well-being in a meaningful way." *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003).

The facts presented do not preponderate against the finding of a change in circumstances that materially affected the Child based on the discrimination and resistance against Father and against his efforts to develop his parental role in the Child's life.

V.

Having determined that Father proved a material change in circumstances, the second part of the analysis was triggered and the referee properly turned to consider the best interest of the Child. As discussed earlier, if a material change in circumstances has occurred, the best interest analysis must follow. *Kiesling v. Keisling*, 196 S.W.3d 703, 718 (Tenn. Ct. App. 2005). To determine what is in a child's best interest, the court considers the relevant factors enumerated in Tenn. Code Ann. § 36-6-106. Those factors include:

> (1) The love, affection and emotional ties existing between the parents or caregivers and the child;
>
> (2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;
>
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment. . .;
>
> (4) The stability of the family unit of the parents or caregivers;
>
> (5) The mental and physical health of the parents or caregivers;
>
> (6) The home, school and community record of the child;
>
> (7) (A) The reasonable preference of the child, if twelve (12) years of age or older;
>
> (B) The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;
>
> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person . . . ;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

Here, the referee considered each factor and made extensive findings of fact in its best interest analysis. As to a majority of the factors, the referee ranked Grandmother and Father equally. Her finding that the best interest of the Child was served by placing her in Father's care turned on its consideration of three factors. Accordingly, we set out the referee's findings as to those specific factors:

> **(1) The love, affection, and emotional ties existing between [Father, Mother, Grandmother and the Child]** – The Child's therapist indicates the child's greatest bond is with her mother; however, the mother has not maintained regular or significant contact with the child since 2005 and the child's mental health diagnosis of Adjustment Disorder stems from the separation anxiety the Child experienced when originally separated from her mother and placed with [Grandmother]. The child is bonded to [Grandmother] and the Child's therapist indicates the child has "two mothers" – [Mother and Grandmother] both occupy that role with the Child. The Child has established a bond with [Father] during the three years he has been visiting with the Child under the direction of the Child's therapist despite the slow transitioning to expanded contact. The Child refers to all her family members in a positive manner and has ranked [Grandmother and Father] almost equally in describing their relationship with her – the Child's responses actually ranked [Father] as slightly higher than [Grandmother] as caregivers. The Child's therapist has indicated it would be devastating for the Child to separate[ ] her from individuals to whom she has a strong attachment. Behavioral and emotional problems have not been exhibited by the Child since March 2007. The Child has

-14-

overcome significant barriers to establish a bonded relationship with a father she did not know until 2005 after being separated from [Mother] who had been her primary caregiver for the first four years of the Child's life. The Child's requests to increase her visitation with [Father] outweigh the Child's reported comments that she does not want to live with [Father] – the Child is reported to have stated a fear she would not see [Mother or Grandmother] again if she resides with [Father] which is similar to the statement made . . . during [Mother's] testimony (the parties were ordered not to discuss the pending Court proceedings with the Child or while the Child was present and the similarity of the Child's concern to [Mother's] statement suggests the Child has been privy to or part of conversations previously proscribed by the Court). The Child's relationship with [Father] is remarkable due to the trust issues the Child would have had to overcome with [Father] (given [Mother's] significant departure from the Child's life) and the obstacles imposed on [Father] in his attempts to develop a relationship with the Child. The Child's representation of [Father] [having] a higher ranking than [Grandmother] is also significant given the amount of time each has been in the Child's life. <u>In the analysis of this best interest factor, [Father] is higher than [Mother or Grandmother]</u>.

* * *

(3) **The importance of continuity in the child's life and the length of time the child has lived in a stable and satisfactory environment** – The Child has resided continuously with [Grandmother] since 2005 when custody was removed from [Mother]. The original agreement between [Mother, Grandmother, and Father] indicated the Child would reside with [Grandmother] and would have an on-going relationship with her parents. [Grandmother] has provided the Child with a stable and nurturing environment and arranged individual counseling to address . . . separation anxiety and adjustment issues . . . . [Father] had not been in the Child's life until 2005 when DNA testing confirmed he was the Child's biological father. [Father] immediately began the process of establishing a relationship with the Child, despite restrictions imposed on [Father] by the

-15-

child's therapist as a result of the Child's reaction to her separation from [Mother]. [Father] has been steady and persistent in his attempts to have a normal relationship with the Child. [Father] has been able to gain the Child's trust because he has not been absent from her life since he learned he was her father. [Mother's] contact with the Child has not been as consistent as [Father's] contact ([Mother] testified she would see the Child either two to three times per week or on alternate weeks) and [Mother] has no set or reliable schedule for visitation (which would appear to have been important in treating a child with separation anxiety). The [Child] has made significant progress in overcoming the stress and anxiety she experienced with [Mother's] departure . . . and the [Child] has responded positively to [Father's] love, attention, and commitment to her welfare. [Father and Stepmother] have provided the [Child] with a stable and nurturing environment during the [Child's] expanding visitation and it is a household where the [C]hild has indicated she wants to spend more time. [Grandmother] and the [C]hild's therapist testified that the [C]hild should be placed with [Mother] when [Mother] is "stable" which suggests continuity for the [C]hild will be changing in the future by agreement between [Mother] and [Grandmother]. If changes in the [C]hild's placement are anticipated, "continuity" should be defined as "commitment to the [C]hild" – [Father] has demonstrated his unfaltering commitment to parenting the [C]hild regardless of the hurdles he must overcome. [Father's] steadfast commitment to his daughter has contributed to her in overcoming the anxiety she experienced when [Mother] relinquished her role as caregiver . . . – a role [Father] has been striving to obtain. <u>With "continuity" being evaluated as "commitment to the [C]hild," [Father] ranks higher than [Mother or Grandmother] on this best interest factor</u>.

**(4) The stability of the family unit of [Father, Mother, and Grandmother]** – [Father] learned through DNA testing that he was the [C]hild's father shortly after his marriage to [Step-mother]. [Father] began a steady and persistent course of action to establish a relationship with the [C]hild with the continued support of his wife. [Father and Stepmother] obtained temporary

. . . custody of [Father's] two grandchildren and are providing appropriate care and supervision for those two children. [Stepmother] has demonstrated her commitment to her husband and to her husband's children and grandchildren by including the children in her family and assuming responsibility for the children's care and supervision. Dr. Thomas Hanaway had the opportunity to interview [Father and Stepmother] and indicated no concerns about [them] as caregivers for the [C]hild. [Mother] reported no concerns regarding [Father's] household and [Grandmother] acknowledged that [Father] was "stable." [Grandmother] was determined to be an appropriate resource for the [C]hild when she was originally awarded . . . custody in 2005. [Grandmother's] household continues to be an appropriate resource for the [C]hild and for the other grandchildren residing in [her] household.

* * *

The family unit of both [Father and Grandmother] can offer the [C]hild stability; however, the greater involvement of Stepmother in assisting [Father] in the care of the [C]hild results in a higher ranking for [Father] over [Grandmother].

Tenn. Code Ann. § 36-6-106(a)(1),(3), and (4). (All emphasis in original).

Here, the referee considered the pleadings, the testimony of the parties, the Child's therapist, and the guardian ad litem, an evaluation by Dr. Hanaway, and the entire record, and found that Father "ranks higher overall in his steadfast determination to provide stability for the [C]hild and to establish an enduring relationship with [the Child]" in ruling that a modification of custody was in the Child's best interest. On our review, the evidence does not preponderate against the referee's findings, as adopted by the trial court, regarding best interest of the Child.

"[A] trial court's decision regarding custody or visitation should be set aside only when it 'falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" **Curtis v. Hill**, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006)(quoting **Eldridge v. Eldridge**, 42 S.W.3d 82, 88 (Tenn. 2001)). In the present case, the referee correctly applied the law to the evidence presented and concluded that there has been a material change in circumstances and that the Child's best interest is served by a change of the primary residential parenting status from

Grandmother to Father. The juvenile court and the circuit court confirmed the referee's findings, analysis, and conclusions in support of its custody determination. The evidence does not preponderate against the common decisions of these courts.

VI.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, L.R. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and for the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE